

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1429-14

### KENNETH WALKER, Appellant

### v.

### THE STATE OF TEXAS

### NO. PD-1430-14

### SHELLEY WALKER, Appellant

### v.

### THE STATE OF TEXAS

## ON APPELLANTS' PETITIONS FOR DISCRETIONARY REVIEW
## FROM THE TWELFTH COURT OF APPEALS
## SMITH COUNTY

YEARY, J., filed a concurring and dissenting opinion in which KELLER, P.J., and KEASLER, J., joined.

## CONCURRING AND DISSENTING OPINION

In their petitions for discretionary review in these consolidated cases, Appellants,

Kenneth and Shelley Walker, argue—at least nominally—that the Court should take this

opportunity to "reexamine the issue of factually sufficient evidence from *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010)." Appellants do not really argue that we should reinstate *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), however, so much as they urge us to apply the part of the legal sufficiency standard that, according to *Brooks*, "essentially incorporates a factual sufficiency review" *into* a review for legal sufficiency under *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks*, 323 S.W.3d at 902 n.19 (plurality opinion).[1] Had the court of appeals applied the legal sufficiency standard in that light, Appellants argue, it should have acquitted them. We granted these petitions *not* to consider whether to reinstate factual sufficiency review, but to examine the court of appeals's judgment with respect to legal sufficiency in light of Appellants' arguments.

Specifically, Appellants argue that the cumulative medical testimony in this case was of a kind that no reasonable trier of fact could have found the essential elements of injury to a child beyond a reasonable doubt. Appellants have not challenged the admissibility of the State's expert testimony—as a function of *reliability* or otherwise—either at trial, on direct appeal, or in their petitions for discretionary review in this Court, and neither did the trial

---

[1] In *Brooks*, the plurality observed:

> Viewing the evidence in the light most favorable to the verdict . . . begins the *Jackson v. Virginia* legal-sufficiency analysis. The *Jackson v. Virginia* standard still requires the reviewing court to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319 (emphasis in original). . . . This is the portion of the *Jackson v. Virginia* standard that essentially incorporates a factual-sufficiency review.

323 S.W.3d 902 n.19 (plurality opinion).

court *sua sponte* invoke its gatekeeping function to exclude that testimony as unreliable.[2]

Nonetheless, Appellants contend that no jury, having heard *all* of the medical testimony, both from the State's two experts and from the defense expert, could rationally have concluded that Appellants were physically capable of causing the victim's injuries.

I agree with Appellants' implicit assumption that, even in the absence of an express challenge to the reliability of expert testimony, a reviewing court may take the reliability of that testimony into account in conducting a legal sufficiency analysis. *See Winfrey v. State*, 323 S.W.3d 875, 884 (Tex. Crim. App. 2010) ("[S]cent-discrimination lineups, when used alone or as primary evidence, are legally insufficient to support a conviction."). Ultimately, however, I cannot conclude that the State's medical testimony in this case was so patently unreliable that it could not possibly have supported a rational jury finding that *someone* caused serious bodily injury to a child. The questions that remain in the legal sufficiency analysis are: (1) Does the evidence establish beyond a reasonable doubt *who* perpetrated the

---

[2] Ordinarily, the proponent of scientific evidence is not called upon to establish its reliability as a predicate to admissibility unless the opponent of that evidence objects to it on that basis. *See State v. Esparza*, 413 S.W.3d 81, 86 (Tex. Crim. App. 2013) (the proponent of scientific evidence is not required to establish its reliability until the opponent challenges it on that basis or "until the trial court, in its capacity as the gatekeeper of the admissibility of scientific evidence, should *sua sponte* call upon it to do so"). Once the trial court puts the proponent to its burden or once the opponent raises a challenge to the evidence, the proponent of the scientific evidence (whether or not it is "novel") must establish to the trial court's satisfaction, by clear and convincing evidence, that the evidence is reliable and therefore relevant. *Hartman v. State*, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Once a certain genre of scientific evidence has been established as reliable in prior cases, the proponent may be able to establish its reliability by asking the trial court to take judicial notice of it. *Hernandez v. State*, 116 S.W.3d 26, 29 (Tex. Crim. App. 2003). The trial court's decision whether to admit such evidence is measured on appeal for abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002).

offense?; and (2) Does the evidence establish that the perpetrator caused serious bodily injury with the requisite intent?

## I. BACKGROUND

Appellants in this case were charged with the offense of intentionally or knowingly causing serious bodily injury to a child, their granddaughter, B.W. TEX. PENAL CODE § 22.04(a)(1). This offense is a first-degree felony. TEX. PENAL CODE § 22.04(e). After a consolidated trial, each Appellant was convicted of that offense and sentenced by the jury to twenty-five years' incarceration in the penitentiary.[3] On direct appeal, they each challenged the legal sufficiency of the evidence to establish that they had perpetrated the offense. In separate unpublished opinions, the Twelfth Court of Appeals affirmed each conviction. *Kenneth Walker v. State*, No. 12-12-00378-CR, 2014 WL 4637963 (Tex. App.—Tyler 2014) (not designated for publication); *Shelley Walker v. State*, No. 12-12-00379-CR, 2014 WL 4637964 (Tex. App.—Tyler 2014) (not designated for publication). We granted Appellants' petitions for discretionary review, and consolidated them, to examine the court of appeals's legal sufficiency determinations.

The question of legal sufficiency in this case turns critically upon three considerations. The first consideration is the efficacy of the medical testimony to establish that B.W.'s injuries were actually *caused* by someone, as opposed to being the result of a regrettable accident for which Appellants bear no responsibility. The second consideration is whether,

---

[3] Appellants were represented at trial by the same pair of attorneys but waived any potential conflict of interest on the record prior to trial.

accepting that the medical evidence establishes that somebody *caused* serious bodily injury to B.W., the evidence otherwise adequately establishes who—Kenneth, Shelley, or both—caused or was criminally responsible for causing the injury. With regard to these two considerations, I would hold that the medical evidence is sufficient to establish that B.W.'s injuries were not accidental. I would also hold that the evidence is legally sufficient to support a jury verdict beyond a reasonable doubt that Kenneth is the one who caused the injuries. By contrast, the evidence provides a basis for nothing more than mere speculation that Shelley had any complicity in causing B.W.'s injuries, which is insufficient to support a rational finding of guilt beyond a reasonable doubt as to her. I would hold that the evidence is legally insufficient to support her conviction, and I agree that she should be acquitted.

The third consideration upon which the legal sufficiency of the evidence in this case turns is whether the evidence demonstrates that Kenneth caused B.W.'s serious bodily injury with the requisite culpable mental state to support a conviction for a first degree felony. Injury to a child is a result oriented offense that requires "a mental state that relates not to the specific conduct but to the result of the conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). To be guilty of a first degree felony, the actor must harbor the conscious objective or desire to cause serious bodily injury, or else he must be substantially certain that his conduct will do so. TEX. PENAL CODE §§ 6.03(a), (b), 22.04(e). With regard to this consideration, I would hold that the evidence is legally insufficient to support a conviction for intentionally or knowingly causing *serious* bodily injury. I would therefore

vacate the judgment against Kenneth and remand the cause to the court of appeals to consider whether the judgment ought to be reformed to reflect conviction for a lesser included offense.[4] Because the Court does not, but instead acquits Kenneth altogether, without allowing the court of appeals to undertake that examination of the evidence, I respectfully dissent.

## II. EVIDENCE AT TRIAL

### A. The Walker Family

Appellants were a married couple in their fifties: Kenneth was fifty-four years old and Shelley was fifty-nine. Each had been married once before and, between them, they had three adult children. Their oldest son together,[5] Kendel,[6] and his wife, Amanda, lived with Appellants in a three-bedroom, two-bathroom duplex in Tyler. Kendel had renal issues and spent a good deal of time in the hospital, which is where he was when the alleged offense

---

[4] The facts of this case bear a passing resemblance to those of our recent opinion in *McKay v. State*, 474 S.W.3d 266 (Tex. Crim. App. 2015). There the appellant was prosecuted for injury to a child when he caused hot water from a cook-pot to spill on a young child, causing (as in the present case) second degree burns. Although the State attempted to prove that the appellant caused the burns intentionally or knowingly, the jury acquitted him of that offense, convicting him instead of the lesser-included offense of causing bodily injury to a child by criminal negligence. *Id*. at 268. We addressed the question whether the evidence was sufficient to support conviction for that lesser offense, holding that it was not. *Id*. at 271. There was no issue in *McKay*, as there is in the present cases, with respect to how the burns occurred or who was responsible for causing them. The only question was whether the appellant did so with the requisite intent. The issue of intent is also involved in Kenneth's case, but the question (for now) is not one of whether he negligently caused bodily injury, but whether he intentionally or knowingly caused serious bodily injury.

[5] Shelley had an older son from her first marriage, Jamie Sloan.

[6] The court reporter spelled Kendel's name "Kendall." However, asked to spell his son's name during one of his police interrogations, Kenneth spelled it as we do in the text.

occurred.[7] Appellants's younger son, Chris, and his wife Carrie, had three small children: B.W. who was almost three years old, N.W. who was almost four years old, and T.W., who was six years old. Child Protective Services [CPS] had removed these three children from their parents shortly after B.W. was born because of neglect and abuse and had placed them with Appellants.

In 2010, CPS conducted a pre-adoption social study to determine Appellants' fitness to formally adopt the children.[8] The investigating social worker noted in her report that she had some concerns whether Shelley would be "overwhelmed," because Kenneth worked at night and slept during the day, and the children were, at that time, all still under the age of four and "a handful." When the social worker asked Appellants about disciplinary measures, Kenneth suggested that Shelley could use a "switch." Shelley reminded him that CPS did not permit corporal punishment, and both Appellants promised to abide by that rule.

The children were indeed "a handful." N.W. had recently been diagnosed with autism and ADHD. He was "mean" and an "instigator" who could be physically abusive toward B.W.[9] N.W. would incite B.W. to play with him in the bathrooms, stopping up the toilets and flooding the sinks and bathtubs. B.W. was fully capable of getting in and out of the bathtubs

---

[7] Kendel had "Stage 3 renal disease." At one point, Shelley had donated a kidney to him.

[8] Appellants formally adopted the children in December of 2010.

[9] Amanda testified that N.W. had "a history of violence": "Hitting, biting, kicking, throwing, punching." During her police interview on February 29, 2012, Shelley asserted that, "every time [N.W.] gets mad, he would hit [B.W.] and slap her and hit her."

by herself, by climbing over the rims.[10] Just a few days before the alleged offense, the children had flooded the bathtub in the bathroom attached to the master bedroom, which Shelley shared with Amanda and B.W.[11] Kenneth had placed locks on the door to the hall bathroom and on the door leading into the master bedroom that were too high for the children to reach, to try to prevent further incidents. Appellants were not strict disciplinarians and did not even yell at the children. To punish the children, they would place them in time outs and occasionally spank them, "[l]ike a love tap[,]"[12] but the children just laughed and did not take it seriously.

Each of the respective indictments alleged that, on February 28, 2012, Appellants "intentionally or knowingly cause[d] serious bodily injury to [B.W.] . . . by holding [B.W.] in hot liquid thereby causing burns to [B.W.'s] feet and legs[.]" At about 8:55 a.m. on that date, Emergency Medical Services [E.M.S.] was summoned to the duplex to attend to B.W., who had suffered second degree burns to both of her feet. By the time E.M.S. arrived, B.W.'s feet were beginning to blister. She was taken first to a local hospital in Tyler, and from there she was soon transported to the regional pediatric burn unit at Parkland Hospital in Dallas.

The State's theory of the case—as evidenced by its examination of certain witnesses and the prosecutor's final argument at the guilt phase of trial—is that Kenneth, exasperated

---

[10] One of the State's medical experts, Dr. Cox, agreed that B.W. could likely get in and out of the bathtubs on her own, since she had managed to escape from one of the high-railed cribs in the hospital ward during her convalescence. Parkland Hospital records listed B.W. at thirty-four inches tall and slightly more than 28 pounds.

[11] Kenneth slept in a second bedroom, and N.W. and T.W. shared the third.

[12] This was Amanda's description.

by the children's behavior, punished B.W. by deliberately immersing her feet in scalding water in the master bathtub for long enough to cause the burns and that Shelley was a party to this deliberately punitive act. The State relies on medical testimony and the fact that Appellants gave a series of inconsistent accounts of what happened to family, medical providers, CPS personnel, and, ultimately, the police. The defensive theory of the case is that the children had climbed into the master bathtub and drawn the scalding water themselves, and that N.W. had blocked B.W.'s egress from the tub long enough to cause the burns. Neither theory was supported by direct evidence, and both theories found some support in—but were also, to a certain extent, contradicted by—the circumstantial evidence and the medical testimony. Appellants argue that the State's theory is simply too speculative to support a jury finding of guilt to a level of confidence beyond a reasonable doubt. To adequately address this contention I must first describe the evidence in some detail.

## B. The 9-1-1 Call

Amanda left the duplex early on the morning of February 28th to get to her job as an aide in an assisted living facility. Kenneth got up next to awaken the children and get T.W. off to school by 8:00 a.m., as usual. Beginning a little after 8:30, according to cell phone company records, Amanda received five calls on her cell phone from Shelley.[13] At first

---

[13] The records show that Amanda actually called Shelley first, at 8:19 a.m. Amanda explained that she had forgotten her wallet and had called to ask Shelley to bring it to her at work. Shelley began to call Amanda at 8:37 a.m. She called Amanda four more times after that, at 8:41, 8:47, 8:50, and 8:58. Amanda estimated that she received as many as ten to fifteen calls from Shelley during this stretch, many of which she was unable to answer, but the phone records do not show that many.

Amanda was too busy to answer the calls, but she finally spoke to Shelley on the third or fourth call. Shelley informed her that B.W. had burned her feet, which were "beet red" and had "bubbled up." Shelley was crying and "didn't know what to do." Amanda consulted her boss, a nurse, at the assisted living facility and then advised Shelley to call 9-1-1. By this time, it had been approximately twenty minutes since Shelley placed her first call to Amanda. Shelley informed Amanda that Kenneth was already on his cell phone with 9-1-1, reporting the injury. E.M.S. arrived within a matter of minutes,[14] and the Tyler police arrived at about the same time.

## C. The Bath Water

When the police entered the master bedroom, the air was "very hot and humid." The master bathtub was "practically full" of hot water. There were a half-dozen bottles of shampoo and a washcloth floating on the water, and a "pencil-sized trickle" of hot water was still coming out of the spigot. The sliding door of the bath/shower had been knocked partly off its track, but it still covered the left half of the opening into the bathtub. Two pairs of children's underwear were found bunched at the base of the bathtub, which is at least "consistent with children getting in bathtubs themselves[.]"

On a later date, the police returned with a warrant to test the temperature of the water,

---

[14] Kenneth placed the 9-1-1 call "roughly around 8:55 in the morning." E.M.S. arrived at the address, 4201 Aberdeen, at 9:01. Amanda called Shelley at 9:03 and again at 9:25. During one of these calls—it is unclear from the record which, but most likely the later one—Shelley told Amanda that she was in the ambulance with B.W. on their way to the local hospital. Amanda clocked out of work at 9:04 a.m. and headed home to the duplex.

both as it came out of the spigot and as it pooled in the bathtub. The hot water heater was located in an interior closet in the duplex, not far from the master bathroom. At the beginning of this testing process, it was not set at its highest temperature, but was "one notch below the maximum temperature." The police first tested the water temperature at this lower setting. The water emerged from the spigot at 120 degrees, Fahrenheit. Then they adjusted the setting of the hot water heater to its maximum heating capacity, let it reheat for 30 minutes, and took the temperatures again. This time the temperature read 131 degrees, Fahrenheit, coming out of the spigot. Allowing the water to collect in the tub to a depth of between four and six inches, they took another temperature reading of the pooled hot water and recorded it at 128 to 129 degrees, Fahrenheit.[15] The police also measured the dimensions of the master bathtub: 55 and ½ inches long, 22 inches wide, and 13 inches deep.

### D. The Medical Testimony

### 1. Dr. Wolf

Dr. Steven Wolf is a highly credentialed burn surgeon and is Chief of Burn Services in the Children's Medical Center at Parkland, which "cares for all of the burned children in North Texas." He treated B.W. at Parkland on the morning of February 29, 2012. Wolf has handled thousands of pediatric burn cases over the course of a seventeen-year career. Part of

---

[15] Of course, nobody purported to say precisely how hot the water had been when B.W.'s feet were burned. However, during his police interrogation on February 29, 2012, Kenneth asserted that, after the police left the duplex on the 28th, he had turned the hot water heater down from its maximum setting. Kenneth also admitted that he had drained the master bathtub after the police left the scene.

caring for children who have suffered burns, he testified, "is to try to figure out how it happened . . . so that we can devise the best treatments . . . for the injury itself." Asked whether he can tell that a burn injury has been inflicted "accidentally," Wolf answered, "I can tell you what the depth of the injury is and what the likely circumstances are by which it occurred."

One of Wolf's residents took a history from Shelley. Shelley told the resident that Kenneth "went into the bathroom after the patient locked herself in the bathroom and found her in the tub, which the patient had filled with hot water herself. And this occurred at around 8:50 a.m., and they called 911 immediately[.]" When he examined B.W., Wolf found that she had "fairly uniform" second degree blistering burns "with a straight line across on the ankles"—"a clear demarcation at the ankle level."[16] He also explained that the depth of the burns was uniform on both the bottoms and tops of B.W.'s feet. This suggested to Wolf that both feet were exposed to water at the same temperature for the same amount of time. Moreover, the fact that the soles of her feet were equally burned suggested an absence of "sparing"—that is to say, it appeared to him that B.W.'s feet had been suspended above the floor of the bathtub, which otherwise would have provided some degree of insulation against burning. Wolf conceded that this might indicate that B.W. had been walking through a tub of scalding water rather than standing still in it. But the uniformity in the depth of the burns and the clear lines of demarcation across the top of both ankles made it appear more likely to him

---

[16] The many color photographs of B.W.'s injuries in the record seem to bear out this description.

that she had been immersed in the tub up to the top of her ankles but not all the way down to the floor of the tub. He testified that she would have had to have been immersed in the water for at least 10 to 15 seconds at a temperature of 131 degrees Fahrenheit, or for at least 12 to 17 seconds at 129 degrees, to sustain the injuries she did. Wolf opined that it does not take a physician to know that it is unlikely that a child would remain standing in water at that temperature for those lengths of time, unhindered.

Wolf admitted that it is "possible" that, if her feet were "beet red" but not yet blistering, B.W. could have been able to walk out into the hallway. He also explained that the absence of "splash marks"—random burns on B.W.'s upper legs, typically indicative of thrashing or struggling to avoid the scalding water—neither proved nor ruled out that she had been deliberately immersed, because the water would have to have been closer to 135 degrees Fahrenheit, to cause burning on contact. He discounted defense counsel's suggestion that B.W. remained in the bathtub as it gradually filled to ankle depth with scalding water, both because of the pain it would have caused B.W. and because, in that event, he would have expected the burns to her toes to be deeper and more severe than the burns higher up around her ankles, since her toes would have been exposed to the heat for longer. Instead, B.W.'s burns were uniform, top to bottom, "indicating that the skin from the ankles on down was in contact for the same amount of time with the same temperature of water."[17] He did not think

---

[17] From the lines of demarcation, Wolf estimated that "there was about 4 inches of her foot that was put into that water." Since there was no sparing on the bottoms of B.W.'s feet, the water would have to have been at least somewhat deeper than four inches if she were forcibly immersed.

B.W. was walking around in the bathtub because "the water is going to go up and down, so there would not be a clear demarcation as there was in this case."

Finally, Wolf conceded that the line of demarcation on B.W.'s left ankle was marginally higher than the one on her right ankle, perhaps on account of the slope of the tub. He also conceded that certain fresh scrapes on B.W.'s left thigh and left chest (which he did not remember noticing when he examined her) might have been consistent with her "sliding" over the metal track of the sliding glass door to get out of the bathtub—though "it could also be other things." And when he was told about Kenneth's various maladies, Wolf acknowledged that "you'd have to really try with those medical conditions" to forcibly immerse a twenty-eight-pound child.

## 2. Dr. Cox

Dr. Matthew Cox is a pediatrician at the Children's Medical Center with a particular expertise in child abuse and neglect. Cox testified that he is the Medical Director of a program called Referral and Evaluation of At-Risk Children ("REACH"), which "evaluates kids when there are concerns of physical abuse, sexual abuse, and neglect." He verified that B.W., "from the ankle all the way down, encompassing both feet very uniformly, had a blistering burn injury that was very uniform in its appearance." On the evening of February 28th, Cox spoke with Appellants together to obtain a history. Kenneth told Cox that

> he had been on the couch watching TV, [Shelley] was off doing some chores, and the kids were watching TV in the bedroom and that he heard [B.W.] screaming, and when he went to find her, he saw her walking out of the bathroom and she had blisters on her feet, and then he checked and saw that

there was some water in the tub.

For her part, Shelley "explained that she was at home but didn't know exactly what had happened, because she wasn't -- she didn't find [B.W.] first. She found out about the burns from her husband."

Like Wolf, however, Cox did not believe B.W.'s burns could have been self-inflicted, as the Appellants' accounts suggested. He testified that the pattern of injury on both B.W.'s ankles—what Wolf had characterized as "a clear demarcation at the ankle level"—"would make this consistent with a forced immersion as opposed to an accidental submersion, because that water line indicates the child was held still rather than what a child her age would be doing[.]" He explained that she "would be moving around and trying to get out of that water that is scalding hot." Thus, like Wolf, Cox believed that "the pattern of the burn injuries would be consistent with an abusive event." Cox agreed that water temperature ranging from 128 to 131 degrees Fahrenheit could cause second degree burns, like B.W.'s, in between ten and twenty seconds of sustained immersion.[18]

On cross-examination, Cox acknowledged that the absence of sparing would indicate that: "one, she either was in there accidentally and was walking around on her own, or; two, . . . she was forcibly submerged in this hot water and held, but elevated[.]" Still, he maintained that the uniformity of the level of the burns and the distinct line of demarcation led him to

---

[18] Unlike Wolf, Cox testified that B.W.'s injury extended only two inches up on her feet, not four. If Cox's estimate is accurate, then, because of the lack of sparing on the bottoms of her feet, the water must have been pooled at a somewhat greater depth than two inches if she was forcibly immersed.

prefer the theory that B.W. was forcibly immersed. He explained:

> Accidental burns also tend not to involve both feet the same, because a normal, almost three-year-old child, when the water is that hot, is going to do everything they can to get out of that water. So they're going to be doing things to move out of that water, and it wouldn't lead to that uniformity.
>
> That's a child who's still, causing burns on both sides, as opposed to a normal almost three year old moving around to get out of that water because it hurts that bad.
>
> * * *
>
> [A] child moving around in the water is going to be moving quickly, so that's not going to be minimal movement in the water. It's going to be moving all around, because she's doing everything she can to dive out of the tub, because it hurts. So that hypothetical wouldn't match with her burns, because a child her age and ability would be moving quickly to get out of water that hurts that bad as soon as you touch it.
>
> * * *
>
> [If the child were moving in the water] you would see asymmetry, because even if you couldn't get both legs up, you would lift one up and stand like a bird, a flamingo or something, you've got one leg out so it didn't hurt both feet. So you'd definitely have asymmetry in that regard.
>
> And also that water line would not be as regular. When we see kids who accidentally fall into things and stuff, it's really irregular because it's only the part that touched that water that's involved. And a normal child moving around is going to keep as much of their skin out of that as possible.

Like Wolf, Cox did not believe the presence or absence of splash marks was necessarily dispositive of forcible immersion: "I think the water line is more key in this circumstance."[19] He ultimately rejected defense counsel's suggestion that B.W. might have

---

[19] Cox acknowledged that an article in the Journal of Pediatrics established that, "at temperatures below 130 degrees Fahrenheit, splash marks do not occur because burning is not

been trapped in the bathtub, blocked in by the sliding door and N.W., long enough to cause the burns. He insisted that "[h]er pattern of burns, no, couldn't be accidental. It's just flat out non-accidental." But he also admitted that he was unaware of Appellants' medical conditions and their "physical capabilities." He maintained that a child B.W.'s size would be "a lot of weight to hold, but you can do it as a single person holding a child in water; not the easiest thing, but definitely could be done by a single person." Cox had no explanation for B.W.'s fresh scrapes. He also acknowledged that B.W. did not present with bruises on her body to suggest that she had been "grasped and held" in the water.

### 3. Dr. Lawrence

Appellants' expert, Dr. Kevin Scott Lawrence, was an emergency room physician with "training in diagnosing and dealing with potential child abuse" who has dealt with "hundreds" of burn cases.[20] Lawrence agreed that, judging by the lines of demarcation on B.W.'s injuries, and the absence of sparing on the soles of her feet, she was either forcibly immersed ("but they had to keep the knees from bending"), or else "the child was walking around in the tub. One of these two is going to have to be the answer."[21]

---

instantaneous at that temperature." Even if the absence of splash marks did not necessarily indicate forced immersion, however, Cox still found the clear line of demarcation of the burns to be an indication that B.W. had not been walking around in the scalding water.

[20] The State challenged Lawrence's qualifications to testify as an expert witness. After a hearing outside the jury's presence, the trial court ruled he was qualified to give an expert opinion based upon his knowledge, skill, experience, training, and education. TEX. R EVID. 702. Appellants did not likewise challenge the qualifications of either Wolf or Cox.

[21] Lawrence testified that B.W.'s burns were "three inches high"—splitting the difference between Wolf's estimate (four inches) and Cox's (two inches). We cannot tell from the photographs

Lawrence described the difficulties inherent in the State's forced immersion theory:

What you have is -- your difficulty is, you have the upper body twisting around. You have the legs trying to retract, assuming you're trying to do a forced submersion burn, and you have close to a 30-pound child.

So, you're sitting here, and someone has to hold these arms. And they're probably not going to face you, because what would happen is, a child would do everything they can, to include biting, if they're facing you.[22]

So you would typically move the child back away from you. You would have to hold these arms like this (demonstrating) and then at the same time have a way in which you could hold these legs here.

And then at the same time, you would have to hold that child up above the bottom of the tub and not use the bottom of the tub as a mechanism to keep that child in place.

So you've got a free-floating child moving up and down, and that would be a very difficult thing to do.

Lawrence next chronicled Appellants' health woes. Though younger than Shelley, Kenneth had recently suffered a heart attack and had had a pacemaker installed. He had also suffered a stroke. He had been operated on for carpal tunnel syndrome in his left wrist, had extensive arthritis and numbness in his left wrist, and had as many as four degenerative discs in his lower back, which required steroid injections to relieve the pain. Shelley has

---

in evidence precisely how far up from the bottoms of B.W.s feet the "clear line of demarcation" goes.

[22] That the line of demarcation was slightly higher on B.W.'s left ankle than her right, Lawrence maintained, was consistent with the theory that she was walking around in the bathtub and that she was facing toward the outside of the bathtub. Because of the slope of the bathtub downward toward the drain, the water would be slightly deeper, and therefore one would expect the burn line to be higher on B.W.'s left ankle if she were standing on the bottom of the bathtub and facing out into the bathroom.

hypertension, "multiple chronic pain issues[,]" and is debilitated by hypertrophy and arthritis, causing abnormalities in her feet.

Lawrence has an undergraduate degree from the Air Force Academy in mechanical engineering and, with this added perspective, he again explained the difficulties inherent in the State's forced immersion theory, especially in light of Appellants' physical limitations, this time in the following terms:

> Okay. What you have in a child who weighs about 30 pounds, when you look at the physics of the problem in the back is, if you hold the child right here (indicating), you have a foot times the 30 pounds. So that's a 30 pound pressure on the back.
>
> When you have to hold the child out a foot, it's 2 feet from the spine and it's 60 pounds of foot pressure on the back of the spine. And then you have a child that's moving up and down, creating an impulse and another force that can add another 40, 50, 60 pounds, you know, that the individual is going to have to keep very, very still.
>
> So you're pushing 60, 70, 80 foot pounds or 5 newtons of pressure against that -- foot pounds of pressure against the spine. And so in a man like Mr. Walker, it would be very, very difficult to do that and make that mechanism and that forced immersion occur.

Asked whether the State's theory was even "less likely" considering that the child had been elevated above the floor of the bathtub, Lawrence continued:

> Your difficulty is, you begin to create more dynamics in the muscles of the back that you have to twist and bend to put the child back and then hold that particular position with that kind of weight and that kind of movement around, and at the same time, keeping the legs not from coming up and moving around.

Lawrence ultimately expressed the opinion that it was improbable that either Appellant could have "forcefully immersed their child in water to cause these burns." He believed that

it was possible that B.W.'s feet were burned while N.W. blocked her egress from the bathtub. The fresh scratches on B.W.'s thigh and chest were consistent with this theory, since B.W. could have scraped herself on the track of the sliding glass door in her efforts to escape the scalding water.[23] Burns such as B.W.'s do not always blister right away, Lawrence explained, and Appellants may have called 9-1-1 as soon as they grasped the magnitude of her injury: "When that recommendation was given by their daughter-in-law, it was an immediate call to 911 with no hesitation at all." He concluded that B.W.'s burns were the result of an accident.

### E. Appellants' Other Various Statements

### 1. Initial Statements: Amanda and 9-1-1

Both Kenneth and Shelley gave various accounts of where they and N.W. had been in the house when they first discovered that B.W.'s feet were burned. The first account was one that Shelley gave Amanda when she called for advice. She first told Amanda that she had been in the master bedroom folding laundry when it happened; she heard water running in the bathroom, but the door was locked so she hollered to Kenneth to come open it. But almost immediately she changed her story, telling Amanda that she had been sitting in her green chair in the living room at the time, that Kenneth was lying on the couch, that B.W. and N.W. were supposed to be watching cartoons in the boys' bedroom, but that they had emerged from the

---

[23] Indeed, had Appellants really intended to immerse B.W. as a means of punishing her, Lawrence proposed, it would have been much easier for one or both of them to do so in the hall bath, which had a shower curtain rather than a sliding glass door.

back of the house, and that B.W. was crying and told them, "I hurt my feet."[24]

Kenneth told the 9-1-1 operator that B.W. "and her little brother got in the bathtub and they turned the hot water on while she was in there and it scalded her feet." When Amanda arrived at the duplex, she encountered Kenneth with N.W. right outside of the garage. Shelley had already left with the ambulance to take B.W. to the hospital. Kenneth told Amanda that he had been in the living room and "he got up and looked around the corner, and [N.W.] and [B.W.] were coming out of the bedroom, and they were crying." Later in the day, Kenneth told Amanda that, when B.W. got burned, Shelley was in the kitchen or dining room, administering medicine to N.W. After that first day, however, both Kenneth and Shelley consistently told Amanda the same story: "that Shelley was sitting in her chair, Kenneth was lying on the couch," when the children emerged from the back of the duplex. This was the version of Appellants' story that Amanda repeated to the police in a follow-up statement that she made on March 5, 2012.

## 2. First Responders

Tyler Police Officer James Lenderman arrived at the scene just after 9:00 a.m. and immediately talked to Kenneth. Kenneth related that he had been in the living room with

---

[24] Amanda maintained that Shelley later explained to her that she had told the false story about folding laundry in the master bedroom in an attempt "to protect" N.W. She was afraid that N.W. would be blamed for B.W.'s burned feet, and she wanted to provide an explanation for how B.W. might have been able to get into the bathroom in spite of the lock Kenneth had placed on the door to the master bedroom. Later, in another phone call with Amanda while at Parkland Hospital, Shelley repeated the second story that she had told Amanda that morning; namely, that she and Kenneth had been in the living room when N.W. and B.W. emerged from the back of the house.

N.W., and that Shelley had been in the kitchen preparing N.W.'s medications when B.W. had locked herself into the bathroom and somehow "gotten into the bathtub and into the hot water." Appellants did not realize there was a problem until B.W. started crying. Lenderman had no reason to believe that, aside from a lack of "enough supervision," B.W.'s burns were "anything more than an accident." Shelley told another officer, John Weaver, that B.W. "had ran water into the bathtub and stepped into it." Shelley similarly reported to Gayle Holt, one of the paramedics, that B.W. "had burned her feet in the tub, that she had crawled in the tub and turned on the hot water[.]"

### 3. The Local Hospital, Parkland, and CPS

Robin Davis was a registered nurse and emergency department supervisor at the East Texas Medical Center where B.W. was originally taken. Shelley told Davis that after Shelley had gotten out of the bathtub, B.W. must have gotten in. Davis found Shelley's demeanor to be "detached and emotion-less." Corey Manges was a trauma nurse clinician at Parkland on duty when B.T. arrived there shortly before 1:00 p.m. Shelley told Manges that B.W. "got out of [Shelley's] sight and then ran and turned on hot water . . . [and] got into the tub." Because of the uniform appearance of the burns—"like the child is wearing socks[,]" is how Manges described them—Manges suspected child abuse and called CPS.[25] Shelley told Kay Garten, who was the "burn social worker" at Parkland, that B.W. had been in the bathroom with

---

[25] Tyler police had already alerted CPS as early as 9:12 a.m. that child abuse was a possibility to be investigated. CPS received another report from East Texas Medical Center before receiving the report from Manges at Parkland.

Kenneth, and when Kenneth left to go check on N.W., B.W. had locked him out of the bathroom.

When CPS investigator Patrick Dullard contacted Shelley on the telephone, Shelley told him "that it was an accident [and] that [B.W.] was in the bathroom and got into the bathtub." Dullard went to the duplex and spoke to Amanda.[26] Amanda related to Dullard the first story that Shelley had told her that morning:

> that while [Shelley] was folding clothes in her bedroom that [B.W.] and [N.W.] we went [sic] into the bathroom and locked the door.
>
> Amanda stated that Shelley had told her that she heard the water running and then she heard [B.W.] scream. She tried to -- or Amanda reported that Shelley told her that Shelley had attempted to open the locked door herself, wasn't able to, so she called Kenneth Walker down at that time and he was able to open the door, and then they found the children in the bathtub at that time and [B.W.] had burned her feet.

Dullard spoke with Appellants together later that evening at Parkland. They told him that they were in the living room when N.W. came out from the back of the duplex. A short time after N.W. joined them in the living room, they heard B.W. crying. When Kenneth went to investigate, he saw B.W. come out of the master bedroom and "both her feet were burned." Appellants told Dullard that they immediately called 9-1-1.

### 4. The Police Interrogations

The lead detective in the case, Michelle Brock, orchestrated two separate videotaped interviews of each Appellant, for a total of four interviews. She interviewed Kenneth once on

---

[26] By this time Kenneth had left to join Shelley at Parkland.

February 29, 2012, the day after the incident, and then directed Detective Gregg Roberts to interview him a second time. Brock and Roberts interviewed Shelley once on February 29th, and then Brock interviewed her again on March 2, 2012.[27] Neither Kenneth nor Shelley admitted to having deliberately submerged B.W.'s feet into scalding water, or to being present when B.W. was burned. Neither one expressed a willingness to believe that the other was responsible. But neither was willing to implicate N.W., nor could they otherwise explain what caused the burns.[28]

---

[27] Both of Shelley's interviews were videotaped. Kenneth's first interview was recorded on audio, and his second interview was videotaped. Appellants did not challenge the admissibility of the recordings in a pretrial motion to suppress, and all four recordings were introduced into evidence, without objection, for all purposes, and were published to the jury. The State introduced transcripts for the record to facilitate the jury's consideration, but none of the transcripts was formally admitted into evidence.

[28] During her trial testimony, Brock expressed her belief that Kenneth and Shelley had both acted as principal actors, cooperating in physically dunking B.W. into the scalding bath water and immobilizing her feet above the bathtub bottom in such a way that she could not flail or kick. On cross-examination, defense counsel pointed out that, because of the sliding door, the opening into the master bathtub was far too narrow to accommodate both Kenneth and Shelley in such an endeavor. On re-direct examination, the prosecutor made it clear to Brock that the State did not endorse Brock's view that both Appellants had been involved in actually dipping B.W.'s feet in the scalding water. He had Brock demonstrate with a doll a way in which either Appellant alone might have been able to immobilize B.W. so as to submerge her feet in the water without resistance. Brock believed that either of the Appellants would have been capable of immersing B.W.'s feet in the bath simply because they were both "mobile" and "able to walk around." In any event, she seemed ultimately to take the view that it did not matter how B.W.'s burns were caused; Appellants were guilty of child abuse simply because they were responsible for B.W.'s welfare at the time she was injured. Later, during his final argument at the guilt phase of trial, the prosecutor urged the jury to find that Kenneth was the principal actor and that Shelley was criminally responsible for Kenneth's act—if only because she had helped Kenneth to "cover up" his crime after the fact. If all Shelley did was to help Kenneth "cover up" his offense, of course, she would not be criminally responsible under Chapter 7 of the Penal Code. See, e.g., Easter v. State, 536 S.W.2d 223, 228 (Tex. Crim. App. 1976) (under the 1974 Penal Code, "accessory has been eliminated as a party to a crime"); Urtado v. State, 605 S.W.2d 907, 912 (Tex. Crim. App. 1980) ("It clearly follows [from Easter] that a person's 'accessory' conduct is no longer recognized under Texas law as conduct making him a party to the

### a. Shelley's First Interview

Asked at the outset to explain what she knew in her own words, Shelley told Brock and Roberts that, after Kenneth left to take T.W. to school, she had settled N.W. and B.W. in the boys' room to watch cartoons.

> So they were in their room, and I was -- my husband come in. He was on the couch. And [N.W.] come out of his room -- come out of the room, and he wanted something to drink. And so I got him something to drink. And in the process, Kenneth heard [B.W.] crying.

> Well, I assumed that she was in the room, because it hadn't been that long since I checked on her. He seen her coming out down the hall, and she come around out of the hall toward the dining room table, and her feet was red and the skin up, it was raised up. And I said, "Where has she been?"

> And Kenneth said, "In your room."

> * * *

> So she come out. And he said that she had been in the room, and I run in there and looked, and there was water in there, and there was stuff all in the tub, like shampoo and stuff.

> And so I run back, and I said, "Call 9-1-1. She has burnt her feet or something."

> It's had -- she's had to get in it and scald it. That's the only thing I could think of.

> Now, I'm not sure -- I know [N.W.] come out of his room -- somebody come out of his room. I'm not saying that he didn't come out of there, had been in there with [B.W.]. I don't know for sure. But they -- [B.W.] was not in there very long.

> And I called 9-1-1 immediately. I mean, that's -- that's the only thing I knew to do. And I mean, it was -- it's a horrible thing, but it was an accident.

crime with which the accused was charged.").

Brock confronted Shelley with the statement that Shelley had made to Robin Davis at East Texas Medical Center—that B.W. had gotten into the master bathtub after Shelley herself had gotten out—and Shelley flatly denied ever having made such a statement.

Shelley reiterated her story that Appellants had both been in the living room, she in her chair and Kenneth lying on the couch, when N.W. came into the living room and Kenneth first heard B.W. cry out. Shelley explained that she had not originally admitted that N.W. was in the bathroom with B.W. because she was "afraid y'all were going to do something to him because he's sick[,]" and she "didn't want y'all to take him from me[.]" Asked how she knew N.W. had been in the bathroom with B.W., Shelley replied: "Because he come up with her and said, '[B.W.] hurt her feet, grandma.' And I knew that people would think he did it."

Brock eventually accused Shelley of telling "six different stories, and now seven." Shelley responded, "The only thing I did not tell you is that I thought [N.W.] -- that [N.W.] was in there." Informed that "[t]he mechanism of injury on her feet is not consistent with the story that you're telling[,]" Shelley responded, "I'm telling you what I know. She walked into the living room with those blisters on her feet." In the face of repeated accusations that either she or her husband had scalded B.W., Shelley repeatedly denied it, insisting that her current story was the truth. Finally, after Brock had left the interview room, Roberts asked Shelley how long Kenneth had been gone to the back of the duplex before B.W. emerged with her feet burned.

MRS. WALKER:  Two or three minutes.

DET. ROBERTS:  Two or three minutes.

MRS. WALKER:  Three or four -- somewhere right in there. I don't know.

DET. ROBERTS:  Give me just a second.

(Det. Roberts leaves room.)

MRS. WALKER:  I don't know why they don't believe me. I'm telling the truth. I'm telling the truth.

With this, the interview ended.

### b.  Kenneth's Interviews

Asked by Brock at the beginning of his first interview to give his account of the events

of the previous day, Kenneth related:

> [N.W.] and [B.W.] went in their room to watch TV. All right. And then my wife and I was in -- she was in the kitchen while I was in the -- while she was in the dining room, whatever, I was in the living room.
>
> * * *
>
> [N.W.] had come in there with [Shelley], and she was doing something with him. And I heard [B.W.] crying, so I got up and went in there, and she was coming out of my wife's room, bedroom, and I noticed her feet was red. And I hollered at my wife. And she went in there and noticed -- seen the water that was in the tub. And I called 9-1-1.

Brock accused Kenneth of telling "a whole different story" than he had previously told the 9-

1-1 operator.[29] Kenneth explained that the discrepancy was "[b]ecause I've had a stroke, and

---

[29] *See* text, *ante*, at 21. It seems that the only material difference between what Kenneth told the 9-1-1 operator and the story he relayed to Brock during this first interview is that he told the 9-1-1 operator that N.W. had been in the bathroom with B.W. instead of with Shelley in the kitchen or dining room. The evidence showed that the kitchen, dining room, and living room were all

I don't know sometimes what I say." Brock asked Kenneth, "Do you think [N.W.] could have done this?" Kenneth responded, "A three-year-old?" Brock followed up by asking, "So [N.W.] couldn't have been in the bathtub with him -- with her like you said it was on this 9-1-1 – [?]" Kenneth replied, "No, I don't think he was."

Later on the 29th, Roberts interviewed Kenneth. This time Kenneth gave an account that was essentially the same as he had given Brock except that he was somewhat less definite with respect to N.W.'s location at the time he discovered B.W. coming out of the master bedroom, but he did assert that N.W. "didn't come from the bathroom." Later, however, with Roberts insisting that "this child's injuries didn't happen the way that I'm being told[,]" Kenneth seemed less sure where N.W. had been, claiming that he had paid no attention to where N.W. had come from. "All I know is when I grabbed [B.W.], [N.W.] was right there. * * * And I don't know which way he come from." He claimed it was Shelley who found the hot water in the master bathtub, and that he had not gone back to the master bathroom until later.

Kenneth insisted that "[i]f I did it, I'd admit it." Roberts then observed that N.W. was not strong enough to have submerged B.W. into the hot water. And Kenneth agreed, asking, "How would he pick her up and sit her in there?" But he also insisted that neither he nor Shelley had done so. Twice more before the interview concluded, Roberts returned to the theme that N.W. could not have been responsible.

---

contiguous rooms with no walls separating them.

DET. ROBERTS:  Is [N.W.] strong enough to have put her in that water?

MR. WALKER:  I don't think so.

DET. ROBERTS:  Doesn't make sense to me.

MR. WALKER:  I don't think so.

\* \* \*

DET. ROBERTS:  Did [N.W.] do this?

MR. WALKER:  He couldn't -- he's three years old. How is he going to pick her up -- her, a two-year-old, up and put her over in that tub?

DET. ROBERTS:  Because it took somebody to hold her down in there.

MR. WALKER:  It didn't happen like that.

DET. ROBERTS:  It didn't? How did it happen?

MR. WALKER:  I didn't see it happen. There's no one there who could do it. It's that simple.

The interview ended shortly after this exchange.

### c. Shelley's Second Interview

Brock began Shelley's second interview by asking her, "[W]hat do you think I should do about all of the previous lies that you have already lied to me about?" Shelley replied that she had only told Brock "one lie"—presumably about N.W.'s whereabouts while B.W. was burned. She continued to insist that she was telling the truth and that she did not know who had caused B.W.'s burns. She denied that N.W. could have held B.W. in the water, and she could not believe that Kenneth would have. Brock asked Shelley, "What would you do if

[B.W.] told us Kenneth did it to her?"[30] Shelley replied that she would believe B.W., elaborating that, "I mean, she's two years old. She don't usually lie about stuff. But -- it's hard for me to believe he could ever do anything like that." From this point forward, Shelley was less adamant that Kenneth could not have done it, but she insisted that he did not do it in her presence and that she "can't see him doing something like that." She denied having ever told Amanda that she had been folding clothes in the master bedroom when B.W. was burned.

Brock reminded Shelley that Dr. Cox "has a sworn affidavit that says this is not an accident. This is something that was done to her."[31] Brock asserted that neither B.W. nor N.W. was "capable of doing that." That left Kenneth. Shelley replied, "If he did it, I want to know. But I didn't see it. I don't know." She reiterated her story that Kenneth was lying on the couch. "And then when she [B.W.] cried, he went around the corner right there. And then in a few minutes, here they came."

Brock left the interrogation room and returned with a CPS investigator (presumably Dullard). He reminded Shelley that she and Kenneth had told him the prior evening that N.W. had come out from the back of the duplex *before* they had heard B.W. crying. Shelley explained again that "I didn't want [N.W.] involved in it."[32] The CPS investigator then asked

---

[30] There is nothing in the record to suggest this was the case. In fact, the record does not reveal whether either the police or CPS ever interviewed B.W. or N.W., much less what either of them may have told anyone about what happened.

[31] Brock later used Cox's affidavit to obtain arrest warrants for Appellants.

[32] Shelley elaborated: "We've had a lot of trouble with [N.W.]. I didn't want them to think anything. I mean, I'm not saying [N.W.] did anything."

Shelley how long Kenneth was gone before B.W. came around the corner crying. "Just a few minutes[,]" she answered. He inquired: "Few minutes or a few seconds?" At first, she replied, "I couldn't tell you how long."[33] A moment later, she said, "Just a few minutes. I mean, I can't say what time."

At this point, Brock interjected.

> DET. BROCK:  Let me ask you this. When you say a couple of minutes passed, is there a chance that she was crying because her and [N.W.] were fighting, Kenneth went in there, something happened and he went to discipline her and this is what happened? Maybe he found them in the bathroom and –

> MRS. WALKER:  I'm not saying that couldn't happen. I'm not saying that couldn't happen. I don't know.

* * *

> DET. BROCK:  But would you agree that there's enough time that had elapsed from the time that he got up till the time she came around the corner that something like that could have happened?

> MRS. WALKER:  Like I said, I really don't know how much time that was, because I just -- everything was so fast. It's hard to remember each thing that -- the time.

The interview ended on this note.

### F.  Jury Charge and Final Arguments

The jury charges authorized the jury to convict both Kenneth and Shelley as either the primary actor or as a party. Each charge incorporated two theories of party liability in the

---

[33] The transcript that was prepared for the jury's assistance at this point reads: "I don't know." I have observed the recorded interviews, however, and what I hear is as set out in the text above.

abstract portion of the jury charge. First, each charge instructed the jury that it could find the Appellant criminally responsible for the conduct of the other if he or she "acted with intent to promote or assist the commission of the offense," and he or she "solicited or encouraged, aided, or attempted to aid" the other in committing it. TEX. PENAL CODE § 7.02(a)(2). Second, each charge instructed the jury it could find vicarious liability for the Appellant "if having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission," he or she "fails to make a reasonable effort to prevent" it. TEX. PENAL CODE § 7.02(a)(3). In the application paragraph of each charge, the jury was told that it could convict the Appellant "acting alone or as a party as that term has been previously defined" in the abstract portion of the charge.

The State argued to the jury that Kenneth was the primary actor and that Shelley was criminally responsible for his conduct:

> He did it. He did it. I firmly believe that the evidence in this case, the evidence that's been presented to you, that man sitting right there (indicating) did this to [B.W.].
>
> And she is a party, because she's actively involved in it. She's actively involved in covering this up. She's actively involved in trying to protect him. And it's deplorable. She's deplorable. And that's what the evidence shows.
>
> * * *
>
> She didn't call 911 immediately. She's an active participant in this. What she was busy doing was trying to take care of the situation, and they were busy trying to cover this up. Real simple. And that's what makes her a party. That's what makes her a party.[34]

---

[34] Appellants did not object that this was a misstatement of law. *See Easter v. State*, 536 S.W.2d at 228 (under the 1974 Penal Code, "accessory has been eliminated as a party to a crime");

The State also emphasized Appellants' many inconsistent stories, essentially as evidence of a consciousness of guilt. Counsel for Appellants explained that their lies were designed to "cover" for N.W., not themselves, and that they had called 9-1-1 as soon as the magnitude of the injury became apparent to them. He also emphasized the improbability of the State's forced immersion theory and the evidence, including the scratch marks, that supported the defense theory of the case. The State responded by emphasizing the medical testimony that the distinctive pattern of the injuries demonstrated forced immersion. Along the way, the prosecutor admitted: "Do I agree that the evidence shows that the two of them both held the child together? I don't think the evidence supports that, okay?" He wrapped up his argument: "And it's absolutely pathetic that the two people that were supposed to love [B.W.] unconditionally had so much rage in them that he did this to her, and she aided and assisted in it and covered it up."

## III. THE COURT OF APPEALS OPINIONS

In separate but nearly identical opinions, the court of appeals held that the evidence was sufficient to support convictions for both Appellants. With respect to Shelley, the court of appeals observed:

> Conflicting inferences may be drawn from the evidence in this case—B.W.'s injuries are the result of (1) forced submersion, or (2) an accident in which B.W. entered a bathtub containing scalding water and could not immediately exit.

---

*Urtado v. State*, 605 S.W.2d at 912 ("It clearly follows [from *Easter*] that a person's 'accessory' conduct is no longer recognized under Texas law as conduct making him a party to the crime with which the accused was here charged.").

It is undisputed that B.W. and N.W. had not taken the Walkers' attempts at discipline seriously because the children would laugh when they were disciplined. It is also undisputed that the children had a history of playing with water in the bathrooms and had flooded Appellant's bathroom the week before B.W. was injured. These facts, when viewed in light of the prosecution's demonstration and testimony that B.W.'s burns were more consistent with forced submersion than an accidental burn, support the inference that, upon finding B.W. playing in Appellant's bathroom with the water running and soaps thrown into the bathtub, Appellant disciplined B.W. by holding her feet in the scalding water.

*Shelley Walker v. State*, 2014 WL 4637964, at *14. Turning to the sufficiency of the evidence to convict Kenneth, the court of appeals said exactly the same thing, except that it added a clause to the last sentence of its analysis to include "Shelley's estimation" during her police interrogations "that Kenneth had been gone two or three minutes before B.W. came into the living room with burned feet[.]" *Kenneth Walker v. State*, 2014 WL 4637963, at *14. Thus, the court of appeals concluded that the jury could have rationally convicted both Appellants of intentionally or knowingly burning B.W. because her burns were "consistent" with forced immersion and because Shelley had a motive—and Kenneth had both motive and opportunity—to do so. The court of appeals did not discuss whether the evidence might have supported conviction for either Appellant on a parties theory of criminal responsibility.

## IV. LEGAL SUFFICIENCY

The standard for determining the legal sufficiency of the evidence is a deferential one: "the relevant question" for the reviewing court to ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.

307, 319 (1979). The Supreme Court in *Jackson* elaborated:

> This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Id*. (footnote omitted).

Accordingly, when all of the "basic facts," viewed in the light most favorable to the prosecution, support a rational inference of the "ultimate facts"—the constituent elements of the offense—to a level of confidence beyond a reasonable doubt, it is the duty of the reviewing court to affirm the factfinder's verdict. But if a review of all the "basic facts," even when viewed in the highly deferential prism of the *Jackson* standard, reveals nothing more than a basis for speculation, however rational, that the accused may have committed the charged offense, then it cannot be said that the State has met its burden to prove guilt beyond a reasonable doubt, and "the jury's finding of guilt is not a rational finding." *Brooks v. State*, 323 S.W.3d 893, 907 (Tex. Crim. App. 2010). "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). "If, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal." *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003).

The court of appeals cited *Hooper* for the proposition—and Appellants now echo that proposition in their discretionary review briefs—that "[i]nference stacking is impermissible[.]" *Kenneth Walker v. State*, 2014 WL 4637963, at *1; *Shelley Walker v. State*, 2014 WL 4637964, at *1. But that is not exactly what our opinion in *Hooper* said. Instead, we simply rejected the rubric of "inference stacking" as unhelpful, observing:

> Inference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal sufficiency review without adding any substance. Rather than using the language of inference stacking, courts of appeals should adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

*Hooper*, 214 S.W.3d at 16-17.[35] Indeed, we have cited *Hooper* for the proposition that "[w]e permit juries to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial." *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). I now proceed to an application of the *Jackson* standard to review all of the evidence in these cases, as summarized above, to decide whether, as Appellants contend, their convictions are based on mere speculation, and not rational inferences deriving from the combined and cumulative force of the basic facts.[36]

---

[35] *See* George E. Dix & John M. Schmolesky, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 51:55 (3d ed. 2011), at 756 ("Analysis of the legal sufficiency of the evidence does not include a prohibition against stacking of inferences although language suggesting such a prohibition appears in older decisions, the Court of Criminal Appeals noted in *Hooper v. State*.").

[36] Appellants also argue that

these two cases establish the need not just for a legal sufficiency review by the appellate courts, but a factual sufficiency review. These cases demonstrate that while

## V. ANALYSIS

### A. Accidental or Inflicted Injury?

From his education, training, knowledge, and long experience as a pediatric burn surgeon, Dr. Wolf concluded that the "most plausible" explanation of the injuries to B.W.'s feet was that they were forcibly immersed in the scalding water. Because of the consistent level of severity of the burns on the tops and bottoms of her feet, he inferred that the whole of each foot had been exposed to (as he asserted repeatedly in his testimony) the same temperature of water for the same amount of time. This circumstance, in combination with the "clear line of demarcation" above her ankles, convinced him that it was more likely that her feet were deliberately immersed in the water, suspended above the floor of the bathtub, than that she was taking steps through the scalding water, as the defense theory maintained.[37]

---

there may be legally sufficient evidence, the verdict was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Appellants Briefs at 20. To the extent this constitutes an invitation to revisit our holding in *Brooks* in which we overruled *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), the Court is right to decline that invitation. Appellants did not ask the court of appeals to conduct a factual sufficiency analysis, and it did not. We granted Appellants' petitions for discretionary review in order to examine the court of appeals's analysis with respect to legal sufficiency of the evidence.

[37] The majority maintains that Wolf's testimony provided no basis other than "speculation" for the jury to conclude that B.W.'s burns were inflicted, and that, "therefore, a rational jury could not have relied on this testimony as a basis for concluding that appellants intentionally caused" her injuries—as opposed to the defensive theory that the burns were accidentally caused. Majority Opinion at 29. I disagree. Wolf gave the jury a solid basis to reject the defense theory that B.W. burned her feet by walking around in the bathtub as opposed to having her feet deliberately suspended above the floor of the tub, as illustrated by the following example:

Q. What do you think about that? Looking at that injury, what's wrong with that scenario?

Had B.W. been walking through the scalding water, the bottoms of her feet, while they might still have been burned, would also have been "spared" to a certain extent and would not have been as severely burned as the tops of her feet. That Wolf found forcible immersion to be the "most plausible" explanation for B.W.'s injuries may not, by itself, have been definite enough to support a rational jury's conclusion to a level of confidence beyond a reasonable doubt.[38] However, on the basis of essentially the same considerations as those that persuaded Wolf, Dr. Cox also insisted that B.W. did not walk through the scalding water, but was forcibly and purposefully immersed.[39] He declared quite forcefully that B.W.'s injuries were "just flat-out

----

A. So, again, the uniformity of the burn with the top and the whole thing is about the same depth, so that -- indicating that the skin from the ankles on down was in contact for the same amount of time with the same temperature of water.

Q. Well, what's happening when the child walks through the water?

A. There will be some differences. The water is going to go up and down, so there would be not a clear demarcation as there was in this case.

[38] An expert's opinion may be reliable enough to be admissible under Article VII of the Texas Rules of Evidence and yet still be insufficiently definite, in itself, to establish the elemental fact to which it is relevant to a level of confidence beyond a reasonable doubt. The proverbial brick is not a wall. Dr. Wolf's expressed level of confidence may have been simply too tentative to make his assertion that B.W.'s injury was the result of forcible immersion more than speculation. *Cf. Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338 (Tex. 2015) (plaintiffs produced no evidence of an essential element of their claim when the expert testimony proffered to support it was based on nothing more than untested "possibilities"). I need not resolve that question, however, in light of Cox's more confident assertion.

[39] Like Wolf, Cox deduced from the pattern of the burns that they had been deliberately inflicted, and they were not the result of B.W. thrashing about in the scalding water. He testified:

A. Well, with [B.W.], the pattern of her burn injuries is what I would call a forced immersion. And being a forced immersion burn, that would not be an accidental-type injury. So the pattern of the burn injuries would be consistent with an abusive event.

> And I say the word "forced immersion" based on the features of the burn; the fact that it's very symmetric, both feet look very similar in their burn pattern, it's a very uniform burn from just above the ankles down to the toes is uniformly burned with the blisters peeling off in these photos.

The majority identifies various reasons to discount Cox's opinion. Majority Opinion at 29-30. None of the considerations named by the majority (*e.g.*, knowledge of the water temperature, lack of bruises) squarely undermines Cox's opinion that, in and of itself, the pattern of the burns indicates a forced immersion. It is true that, for the kind of reasons the majority gives, a rational jury could have rejected Cox's opinion. But here the jury convicted both appellants, and we are supposed to assume that the jury chose to credit that opinion. It was not irrational to do so, despite the various ways that Cox's testimony might have been inferentially impeached. To reject Cox's testimony as insufficient *as a matter of law* to support the jury's conclusion that the burns were indeed inflicted, not accidental, is to intrude upon the jury's prerogative to judge weight and credibility—antithetical to a proper legal sufficiency review.

The majority opinion also takes the position that Cox's opinion lacks probative value as a matter of law because it was not sufficiently supported by objective facts. Majority Opinion at 32-34. It is true that, to the extent Cox may have thought that a lack of splash marks supported his conclusion of forcible immersion without knowing the water temperature, his opinion may have been less than optimally informed. But that does not mean there was no rational basis in the facts to support his opinion. As I have pointed out repeatedly, both Wolf and Cox based their opinions mainly on the uniform degree of the burns and their distinctive patterns, and on what their education, training, and experience told them about how burns of that uniformity and pattern are typically caused. Their opinions, while they were subject to impeachment (and were, in fact, impeached for all the reasons that the majority opinion gives), were based on proven facts, and the jury was not irrational to accept them.

The majority relies upon a pair of civil cases for the proposition that the opinions of Drs. Wolf and Cox in this case were too unreliable to support a verdict because they were based upon insufficient underlying facts. Majority Opinion at 31-32 (citing *Coastal Transp. Co, Inc. v. Crown Central Petrol. Corp.*, 136 S.W.3d 227 (Tex. 2004), and *Volkswagen of America, Inc. v. Ramirez*, 159 S.W.3d 897 (Tex. 2004)). Those cases stand for the proposition that expert testimony may prove too unreliable to support a verdict "if there is too great an analytical gap between the data on which the expert relies and the opinion offered." *Gharda USA, Inc.*, 464 S.W.3d at 349 (quoting *Volkswagen of America, Inc.*, 159 S.W.3d at 904-05). I do not disagree with that proposition in principle. *See* note 38, *ante*. And indeed, this Court has adopted something like it in *Winfrey*, in which we refused to regard evidence of a discredited dog-sniff lineup to be, by itself, legally sufficient "to establish a person's guilt beyond a reasonable doubt." 323 S.W.3d at 884-85. But that proposition has no application to this case. Both Wolf and Cox testified that, in their expert opinions, *someone* forcibly immersed B.W.'s feet into the scalding water. They did not purport to say who did it, or with what intent. Their opinions were based upon sufficient underlying facts—the uniform

non-accidental." This was a rational inference—a conclusion that was rationally derived from certain predicate facts that the jury could reasonably have found to be true—even (at least combining Wolf's explanation and Cox's level of certainty) to a level of confidence of beyond a reasonable doubt.[40]

The defensive evidence, on the other hand, including Dr. Lawrence's testimony, emphasized the difficulty inherent in forcibly immersing a child, even a child of B.W.'s relatively small size and weight. This difficulty would have been exacerbated, Lawrence claimed, by Appellants' physical disabilities and the limited space within which they would have had to operate. Lawrence's testimony might have caused rational jurors to doubt the

---

severity and the pattern of the burns—and those underlying facts, viewed through the prism of their education, training, and experience, convinced Cox, and to a slightly lesser extent, Wolf, that B.W.'s burns were the result of forcible immersion. It was then up to the jury, in the event that it should choose to credit these expert opinions, to determine whether the State had established, to the requisite level of confidence, *who* forcibly immersed B.W.'s feet, and with what level of intent.

[40] There was no challenge, by either the trial court or defense counsel, to either Wolf's or Cox's qualifications to give such opinions or to the sufficiency of the underlying facts that supported them. *See* TEX. R. EVID. 705(c) ("An expert's opinion is inadmissible if the underlying facts and data do not provide a sufficient basis for the opinion."). The Texas Legislature has recently passed a statute permitting post-conviction habeas corpus applicants to challenge their convictions based upon new developments in "relevant scientific evidence." TEX. CODE CRIM. PROC. art. 11.073. Where subsequent empirical research may call into question scientific testimony, an inmate may resort to Article 11.073 to challenge the reliability of the science as it was understood to be at the time of trial. But the record as it comes to us in this appeal provides no basis to challenge the reliability of either Wolf's or Cox's testimony.

State's evidence of forced immersion.[41] But it would not have compelled them to.[42] In fact, it might have worked the other way around. A rational jury could have credited the evidence of forced immersion and, for that reason, chosen to believe that, despite the inherent difficulties, *somebody* must have acted in such a way as to cause burns to B.W.'s feet.[43]

---

[41] The majority concedes that Dr. Lawrence agreed with Dr. Wolf "that the burns could have been inflicted by forced immersion or by the child walking around in the water." Majority Opinion at 17. Wolf's and Cox's testimony gave the jury a concrete factual basis to prefer the first scenario.

[42] This is, in other words, "a record of historical facts that supports conflicting inferences[,]" in which case a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. This principle applies, the Supreme Court has made explicit, to disputes among medical experts. *See Cavazos v. Smith*, 132 S. Ct. 2 (2011) (when evidence presented the jury with competing medical explanations for the cause of an infant's sudden death, it was the jury's prerogative to accept the conclusions of the State's experts, which supported conviction). In *Cavazos*, the Supreme Court observed:

> Doubts about whether Smith is in fact guilty are understandable. But it is not the job of this Court, and was not that of the Ninth Circuit [in federal habeas corpus review of the state conviction], to decide whether the State's theory was correct. The jury decided that question, and its decision is supported by the record.

132 S. Ct. at 7.

[43] The majority concludes that "the jury acted irrationally in deferring to the experts' unsupported conclusions that Kenneth, Shelley, or both of them, intentionally caused the injury to the victim when they found the defendants guilty of the offense of intentional injury to a child." Majority Opinion at 34. Once again, this misconceives the significance of the expert testimony in this case. Neither Wolf nor Cox testified that it was Kenneth and/or Shelley who intentionally caused B.W. serious bodily injury. Neither expert expressed any opinion as to who might have caused B.W.'s injuries, or with what specific intent. They simply expressed the opinion that her injuries were the result of being forcibly immersed and immobilized in the scalding bath water as opposed to her having been walking around in it. Their testimony was not speculative. It was a product of their education, training, and experience brought to bear on the distinctive characteristics of the particular injury that they saw. It was not irrational for the jury to have credited that testimony. Having done so, it would next be up to the jury to decide whether the evidence established beyond a reasonable doubt that it was Kenneth, Shelley, both, or neither who perpetrated the forced immersion, and with what specific level of mental culpability. Neither Wolf nor Cox expressed any

The remaining questions for the jury would have then become twofold; first, whether it could determine to a level of confidence of beyond a reasonable doubt *who* did it. Could the jury find either Kenneth or Shelley to have caused B.W.'s burns without indulging in mere speculation? And second, if so, could the jury find beyond a reasonable doubt that they harbored the requisite intent to cause the alleged result—serious bodily injury—by immersing her feet in the hot water?

## B.  Identity

In *Hooper*, we offered a hypothetical to illustrate the difference between a rational inference, which may support a conviction, and mere speculation, which will not:

> A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking.) Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation.

214 S.W.3d at 16. In the instant case, B.W.'s deliberately caused injuries take the place of the the *Hooper* hypothetical's dead woman on the floor. That is to say, from the evidence that B.W.'s injuries were inflicted, not accidental, it can be inferred that *someone* caused them.

_____

opinion about these issues.

But who?

As the Eighth Court of Appeals has noted, "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd). The inference is patently rational: a child has been purposefully injured, and only one person was in a position to have caused that injury. Here the evidence shows, however, that neither of the Appellants was alone in the duplex with B.W. There were three others there besides B.W., and no obvious "smoking gun." The jury could rationally have ruled out not-quite-four-year-old N.W. as the perpetrator. No witness expressed the opinion that he was remotely capable of the act of forcibly immersing B.W.—dipping her feet in the bathtub while suspending them above the bottom, and rendering her immobile in that position for at least ten to fifteen seconds.[44] That leaves Kenneth and Shelley; but the circumstantial evidence in this case is not as compelling as the smoking gun in the *Hooper* murder hypothetical from which to infer which of them (if either) may have been the perpetrator to the exclusion of the other. For the evidence to suffice to convict either one or both of them, it must show either: (1) that they acted in concert as primary actors in immersing B.W.'s feet in the scalding water; (2) that one of them was the primary actor while the other was criminally responsible as a party to the conduct of the primary actor; or (3) that one of them acted alone.

---

[44] The record shows that N.W. was barely bigger than B.W.

### 1. Shelley

### a. Primary Actor

The State urged the jury to find that Kenneth was the primary actor and that Shelley was criminally responsible for Kenneth's conduct. I agree with the prosecutor's implicit concession that the evidence fails to establish that Shelley was the primary actor. None of the various conflicting accounts that Amanda, Kenneth, or Shelley told of how B.W. got burned ever placed Shelley in the master bathroom at the same time with B.W. The record also provides ample explanations for Shelley's untruthfulness for reasons other than to cover up her own personal complicity in actually immersing B.W. in the scalding water. She might have been trying to deflect any possible blame from N.W., as she first told Amanda and later repeated during her police interrogation. Alternatively, she might have been hoping, after the fact, to insulate Kenneth from primary actor liability. In either event, her inconsistent statements do not, by themselves, support a rational inference that she herself was a primary actor. The record showed, without contradiction, that Shelley had never used—and had never even been inclined to use—corporal punishment of any kind, much less the extreme form the State asked the jury to believe she inflicted in this case. In short, even accepting the evidence of corpus delicti in this case, there is insufficient evidence of either inclination or opportunity on Shelley's part that could rationally support her conviction as a primary actor.

### b. Party Liability

Nor does the record support an inference that Shelley was guilty even as a party to a

primary act committed by Kenneth. Even if her various lies were not genuinely meant to protect N.W., as she claimed, but were intended only to cover up Kenneth's misconduct, they do not establish that, with the intent to promote or assist Kenneth's offense, she solicited, encouraged, directed, aided, or attempted to aid him before or during its commission. TEX. PENAL CODE § 7.02(a)(2). And while Shelley undoubtedly had assumed a legal duty to prevent commission of the offense, obliging her to make a reasonable effort to do so, there is nothing to show that any failure on her part to do so was accompanied by the requisite specific intent to promote or assist its commission—indeed, nothing to show that she even had reason to anticipate it would be committed, so as to require a reasonable effort on her part to stop it. TEX. PENAL CODE § 7.02(a)(3).[45] If Shelley did not formulate an intent to protect Kenneth from prosecution until after she discovered that he had committed the offense, she would not be subject to party liability under either of these theories, since accessories after the fact are no longer "parties" under Texas law. *See Easter v. State*, 536 S.W.2d 223, 228 (Tex. Crim. App. 1976) (under the 1974 Penal Code, "accessory has been eliminated as a party to a crime"); *Urtado v. State*, 605 S.W.2d 907, 912 (Tex. Crim. App. 1980) ("It clearly follows [from *Easter*] that a person's 'accessory' conduct is no longer recognized under Texas

---

[45] As reflected by Section 7.02(a)(3) of the Penal Code, the Legislature does not share Detective Brock's apparent attitude that Appellants should be convicted simply because B.W. was injured while under their care. *See* note 28, *ante*. Instead, the law requires that the failure to make a reasonable effort to prevent the commission of an offense be with the specific intent to promote or assist its commission.

law as conduct making him a party to the crime with which the accused was here charged.").[46]

While the conclusion that Shelley participated as a party is not wholly inconsistent with the facts as established by the evidence, I conclude that, even viewing all of the evidence in the light most favorable to conviction, it provides no more than a basis from which a rational jury could speculate that she might have been a party to injury to a child.[47] Though it may have been rational for the jury to believe the "basic facts" from which the State would have it deduce Shelley's guilt, those facts were insufficient to support a rational jury inference that the "ultimate fact"—her criminal responsibility, even as a party to Kenneth's primary act—was true, at least not to the level of confidence of guilt beyond a reasonable doubt. On that basis, I agree with the Court that the evidence was legally insufficient to convict Shelley either as a primary actor or a party.

## 2. Kenneth

---

[46] *Cf.* Dix & Schmolesky, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 51:77, at 780 ("A witness whom the evidence shows provided assistance to the accused after the accused committed the crime charged is . . . not an accomplice witness even if the witness is subject to prosecution for hindering the accused's apprehension or prosecution. This applies, for example, if the evidence shows that the witness lied to investigating officers in an effort to direct the investigation away from the defendant.").

[47] It is true that the State has no "affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt[.]" *Jackson*, 443 U.S. at 326. *See Temple*, 390 S.W.3d at 363 ("[I]t is not the State's burden to exclude every conceivable alternative to a defendant's guilt."). Nevertheless, it does have a duty to present more than simply evidence that is *consistent* with the conclusion that an accused is guilty, because that quantum of evidence will not support a conclusion of guilt *beyond a reasonable doubt*. Evidence from which a jury may reasonably *speculate* that the accused committed the offense with which he is accused does not satisfy that standard. *See Hooper*, 214 S.W.3d at 16 ("A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.").

By contrast, the evidence does present a concrete basis for the jury to infer that Kenneth actually caused B.W.'s injuries. As the court of appeals noted, during Shelley's police interrogation, she reluctantly conceded that Kenneth had gone to the back of the duplex for perhaps as long as two or three minutes before she saw B.W. emerge from "around the corner" with burns on her feet.[48] If B.W. and/or N.W. had already drawn the scalding water in the bathtub by the time Kenneth found B.W. in the master bathroom, then the two or three minutes in which he was apparently with her would have provided him enough time to forcibly immerse her feet for at least 10 to 15 seconds. Thus, the State produced some evidence from which a jury, if it believed the medical testimony that *someone* purposefully immersed B.W.'s feet into the scalding water, could conclude that, despite his physical limitations, Kenneth must have been the perpetrator.

Can it be said that the State, having thus satisfied its burden of production—some evidence from which it could infer that B.W. was forcibly immersed and that Kenneth was the perpetrator—has also met its ultimate burden of persuasion? In other words, does the inference that Kenneth was the perpetrator have sufficient force, viewing *all* of the evidence

---

[48] At one point in its recitation of the facts, the majority observes that "no version of the event included an assertion that either adult was in the bathroom when [B.W.] was injured." Majority Opinion at 8. While Shelley's statements do not specifically place Kenneth *in the bathroom*, she does place him in that part of the house at the time B.W. apparently suffered her injuries. The majority fails to acknowledge that, in both of Shelley's statements to the police, she admitted that Kenneth had been in the back of the duplex for two or three minutes before B.W. emerged with the burns on her feet. The court of appeals conspicuously relied on this fact in its opinion. *Kenneth Walker v. State*, 2014 WL 4637963, at *14. I do not understand how the Court today can acquit Kenneth altogether without at least addressing the significance of this evidence.

in the light most favorable to the State, that it could serve to convince a rational jury of his guilt to the requisite level of confidence—beyond a reasonable doubt?[49] After all, the source of the only evidence from which the jury could infer that Kenneth was the perpetrator—Shelley's police interrogations—was apparent hearsay with respect to Kenneth.[50] Because Kenneth did not object on that basis, the jury was entitled to give it whatever intrinsic probative value it may have. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay.").

---

[49] We have said that "a rigorous and proper application of the *Jackson v. Virginia* legal-sufficiency standard is as exacting a standard as any factual sufficiency standard." *Brooks*, 323 S.W.3d at 906. We gave as a hypothetical illustration of this proposition the case of the store clerk who identifies the defendant as the one who robbed him when "a proper authenticated surveillance videotape of the event shows" that it was someone else. *Id*. at 906-07. We observed that, while it was "within the jury's prerogative" to choose to believe the store clerk over the video, a conviction based upon that belief would be irrational in view of "*all* the evidence" presented. In essence, we held that, in the hypothetical example, although the State had met its burden of *producing* some evidence which, in isolation, would support an inference of guilt, other irrefutable evidence could serve to render a jury verdict based on that evidence—at least to a level of confidence *beyond a reasonable doubt*—irrational, *i.e.*, insufficient to satisfy the State's ultimate burden of *persuasion*. In the instant case, I would conclude that the inferential value of the State's evidence was not so undermined by other evidence in the case that no rational jury could rely on it to find that Kenneth caused B.W.'s injuries.

[50] It is not readily apparent to me whether Shelley's out-of-court interrogations might be regarded as non-hearsay under Rule 801(e) of the Rules of Evidence, which deems statements made by co-conspirators not to be hearsay. TEX. R. EVID. 801(e). There is no evidence that Kenneth and Shelley formulated an agreement to cause B.W. serious injury prior to the offense. Although there is some suggestion in the record that they may have colluded after the offense to coordinate their stories, if their agreement to lie to the police (if any) was only to protect N.W., and not to provide one another with a means of avoiding arrest, then it is not at all clear that they have even conspired to commit the offense of Hindering Prosecution under Section 38.05(a)(2) of the Penal Code. TEX. PENAL CODE § 38.05(a)(2). Nor do any of the exceptions to the hearsay rule enumerated in Rule 803 jump out at me as providing a likely justification for the admission of Shelley's out-of-court assertions for use against Kenneth. TEX. R. EVID. 803. I express no ultimate opinion on any of these questions at this juncture, of course.

It is possible to assail the probative value of Shelley's assertions that Kenneth was in the back of the duplex with B.W. for as long as several minutes. After all, the police interrogators were pressuring her and suggesting to her that this might have been the case. While on more than one occasion Shelley volunteered, without prompting, that Kenneth was gone for as long as a "few minutes," she frequently followed up this assertion with a statement that she did not really know, and could not really say, how long he had been gone. There is, in short, a concrete basis in the record from which the jury could have doubted the reliability and accuracy of Shelley's statements and discounted their weight. Many juries might have harbored a reasonable doubt on that basis and acquitted Kenneth for that reason.

But, as with the medical evidence regarding whether B.W. was forcibly immersed, it was ultimately the jury's province to decide what weight to ascribe to Shelley's hearsay statements. *See Fernandez v. State*, 805 S.W.2d 451, 456 (Tex. Crim. App. 1991) (Where unobjected-to out-of-court declaration of a witness was inculpatory, but it contradicted her exculpatory trial testimony, the jury was entitled to credit her out-of-court statement over her trial testimony and convict on that basis, rendering the evidence legally sufficient). That Shelley may have been prodded by police to assign a definite period of time during which Kenneth was gone, and though she may have insisted that it was just a rough estimate, and that she could not be certain, are factors that are relevant to the jury's assessment of the strength of the inference that Kenneth was the perpetrator. But it does not eliminate the logical force of the inference altogether or render it rank speculation. Whether it established

Kenneth's guilt as the principal actor to the requisite level of confidence was a jury question. "The opinion of the [United States Supreme] Court in *Jackson v. Virginia* . . . makes clear that it is the responsibility of the jury—not the [reviewing] court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011). Even if some rational jury might have rejected the inference deriving from Shelley's time estimate and acquitted Kenneth,[51] that does not mean that this jury was irrational to accept the inference and believe that it established that Kenneth caused the injuries—even to the level of confidence of beyond a reasonable doubt. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). Like the court of appeals, I conclude that the evidence was legally sufficient for a rational jury to conclude that Kenneth caused B.W.'s serious bodily injury.[52] The final issue is whether the evidence supports a rational jury conclusion that he did so intentionally or knowingly, so as to justify his conviction for a first-degree felony.

## C. *Mens Rea*

Serious bodily injury is any bodily injury that "creates a substantial risk of death or that

---

[51] "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos v. Smith*, 132 S. Ct. at 4.

[52] Had trial counsel requested and obtained a limiting instruction in this consolidated trial that restricted the jury's use of Shelley's hearsay assertions to consideration of her guilt or innocence, and not Kenneth's, the evidence may well have proven legally insufficient on this basis to convict Kenneth too. It would have provided no basis for the jury to determine who—Kenneth or Shelley, or both—was responsible for causing B.W.'s injuries. But trial counsel requested no such instruction, and Shelley's statement was admitted for all purposes, to Kenneth's detriment.

causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE § 1.07(46). The court of appeals held that the evidence was sufficient to establish that Appellants caused serious bodily injury based upon Dr. Wolf's testimony that, if left untreated, B.W.'s injuries posed "a relatively high risk of infection and ongoing systemic problems with that[.]" *See Kenneth Walker v. State*, 2014 WL 4637963, at *15 (citing *Stuhler v.State*, 218 S.W.3d 706, 714 (Tex. Crim. App. 2007) for the proposition that we measure seriousness of the injury "as it was inflicted, not after the effects have been ameliorated . . . by . . . medical treatment"). But the court of appeals did not expressly inquire whether the evidence was sufficient to show that it was Kenneth's conscious objective or desire to cause B.W. such a serious injury, nor whether it would support a rational jury conclusion that he was reasonably certain that his conduct would cause that level of injury. *See* TEX. PENAL CODE § 6.03(a) ("A person acts intentionally . . . with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result."); *id*. § 6.03(b) ("A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonable certain to cause the result.").

Specific intent is ordinarily inferred from circumstantial evidence. *E.g. Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) ("Absent a judicial confession, the requisite culpable mental state must ordinarily be inferred from the acts of the accused or the surrounding circumstances."); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the

conduct of the appellant."). "[C]ircumstantial evidence of intent is reviewed under the same standard as circumstantial evidence of other elements." *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009). It is hard to imagine under the circumstances as presented in this case that Kenneth could have had any other reason to immerse B.W.'s feet into the hot water but to punish her for continuing (along with her brother) to wreak havoc in the bathrooms of the duplex. But it would amount to sheer speculation to conclude that Kenneth intended to, or was reasonably certain his conduct would, cause B.W. life-threatening or disfiguring injury, or the protracted loss of an organ or limb. Nothing in the record suggests that Kenneth was reasonably certain his conduct would cause "a relatively high risk of infection and on-going systemic problems," as Wolf testified, much less that it was Kenneth's conscious objective or desire to do so. The evidence suggested that neither Kenneth nor Shelley was a strict disciplinarian, even in the face of the children's bad bathroom behavior and N.W.'s violent tendencies. Assuming that Kenneth nevertheless lost his temper and immersed B.W.'s feet, there is nothing in the record to show he knew exactly how hot the water was—or how hot it would have to be—to cause B.W. serious bodily injury.

Though the evidence places Kenneth in the bathroom for the two or three minute period necessary to infer that it was he who deliberately immersed B.W.'s feet in the hot water, that was not enough time to justify an inference that he could have drawn the bath-water himself and precisely gauged its temperature to be hot enough to cause second-degree

burns.[53] Finally, while the inconsistency in his stories after the fact is certainly some evidence of a consciousness of guilt, it would provide a rational fact-finder no basis to prefer the theory that he felt guilty of having *intended* to cause serious bodily injury—as opposed to simply feeling guilty once he realized he had in fact *caused* that extent of injury, however unintentionally. Viewing *all* of the evidence, even in the light most favorable to the prosecution, I would hold that the State failed to produce evidence sufficient to support a rational jury finding that Kenneth committed the first-degree felony offense of intentionally or knowingly causing *serious* bodily injury.[54]

---

[53] There is no evidence that Kenneth was actually aware that the hot water heater was set at its maximum temperature until after the police left the scene. In the two to three minutes that Shelley's statements place Kenneth in the back of the duplex along with B.W., he could not have had sufficient time to run the hot water into the bathtub himself. There is no evidence that he was aware that the children had turned on *only* the hot water tap. There is no evidence that he actually touched the water to ascertain exactly how hot it was before he immersed B.W.'s feet into it. In the face of these uncertainties, a rational juror had no basis to do anything more than speculate that Kenneth was reasonably certain that his conduct would cause serious bodily injury. TEX. PENAL CODE § 6.03(b).

[54] I am not unmindful of our holding in *Thompson v. State*, 236 S.W.3d 787 (Tex. Crim. App. 2007). There the jury charge authorized the jury to convict the defendant of the first degree felony offense of injury to a child on evidence that the defendant intentionally or knowingly caused mere bodily injury, utilizing the transferred intent provision in Section 6.04(b)(1) of the Penal Code. *See* TEX. PENAL CODE § 6.04(b)(1) ("A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . a different offense was committed[.]"). That was a case, however, in which the jury was actually instructed in the terms of this transferred intent provision. There was no such instruction in Appellants' case, nor any mention of transferred intent or Section 6.04(b)(1). Had the trial court included a Section 6.04(b)(1) transferred intent theory in the abstract jury instruction but simply failed to apply that law to the facts in the application paragraph, we would likely still regard it as a part of the hypothetically correct jury charge against which to measure the sufficiency of the evidence. *See Manrique v. State*, 994 S.W.2d 640, 642 (Tex. Crim. App. 1999) (where trial court's charge included transferred intent abstract law portion but not in the application paragraph, the court of appeals erred not to consider it in gauging sufficiency of the evidence under *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)). By contrast, when transferred intent was neither raised at trial nor included in the jury charge in any form whatsoever, I would not factor it into the sufficiency

## D. Reformation of the Judgment

We granted discretionary review specifically to determine whether the evidence was sufficient to support conviction for the offense of intentionally or knowingly causing serious bodily injury to a child. We did not grant review to decide whether the evidence might support conviction for any lesser-included offense. In deciding whether to reform a judgment to reflect conviction for a lesser-included offense, a reviewing court must answer two questions: (1) did the fact-finder that convicted the appellant of the greater-inclusive offense necessarily find every element necessary to convict him of the lesser-included offense, and (2) does the record reflect legally sufficient evidence to support conviction of that lesser-included offense. *Thornton v. State*, 425 S.W.3d 289, 299-300 (Tex. Crim. App. 2014). "[A]n appellate court should not render a judgment for conviction for a lesser-included offense unless there is proof beyond a reasonable doubt of all elements of the lesser-included offense." *Britain v. State*, 412 S.W.3d 518, 521 (Tex. Crim. App. 2013).

I would leave the question of whether it is appropriate to reform Kenneth's conviction to reflect a lesser-included offense under *Thornton* to the court of appeals to resolve in the first instance on remand, with additional briefing from the parties if the court of appeals were to deem it useful. *See, e.g.*, *State v. Elias*, 339 S.W.3d 667, 678-79 (Tex. Crim. App. 2011)

---

analysis. *See Wooley v. State*, 273 S.W.3d 260, 268-72 (Tex. Crim. App. 2008) (the court of appeals erred to affirm the conviction on the basis that the law of parties made the evidence legally sufficient when the law of parties was neither mentioned at trial nor included in any guise in the trial court's charge); George E. Dix & John M. Schmolesky, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 51:32 (3 d ed. 2011) ("The Court of Criminal Appeals in *Wooley v. State* held that a court of appeals's application of *Malik* violated federal due process requirements.").

(remanding the cause to the court of appeals to address alternative issues not yet addressed in that court and inviting it to solicit additional briefing from the parties "as it sees fit").

## VI. CONCLUSION

Accordingly, like the Court (but for different reasons), I would reverse the judgment of the court of appeals in *Shelley Walker v. State*, No. 12-12-00379-CR, and remand that cause number to the court of appeals for the entry of a judgment of acquittal. On that basis, I concur in the Court's judgment in Shelley's case. But I would vacate the judgment of the court of appeals with respect to *Kenneth Walker v. State*, No. 12-12-00378-CR, and remand that cause number to the court of appeals to address whether the evidence may have been sufficient to convict Kenneth of a lesser-included offense, and, if so, what lesser-included offense. Because the Court prematurely acquits Kenneth altogether, I respectfully dissent to the Court's disposition of his case.

FILED:                October 19, 2016
DO NOT PUBLISH